**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X

NARDA DUCHEINE,                                    1:17-cv-05120 (GBD)

                              **Plaintiff,**

          **-against-**                                    **COMPLAINT**

**NYC HEALTH + HOSPITALS and**
**METROPLUS HEALTH PLAN,**
                              **Defendants**
-----------------------------------------------------------------------X

  **PLAINTIFF NARDA DUCHEINE** (hereinafter referred to as "Plaintiff), by her attorneys, Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, New York 10006, as and for her Complaint alleges, upon knowledge with respect to herself, and upon knowledge, information and belief as to all other matters, as follows:

  1. Plaintiff brings this action against Defendants New York City Health + Hospitals Corporation (hereinafter "Defendant HHC") and MetroPlus Health Plan (hereinafter "Defendant MetroPlus"), collectively referred to throughout as "Defendants", due to its unlawful discrimination against Plaintiff on the basis of her race, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) *et seq.* ("Title VII"). Plaintiff alleges that Defendants discriminated against her due to her race, subjected Plaintiff to a hostile work environment with respect to the terms, conditions, and privileges of her employment including, without intending to limit, wrongful termination, limiting, segregating and classifying her in such a way as to deprive Plaintiff of equal employment opportunities and/or otherwise adversely affecting her status as an employee because of her race; Plaintiff further brings this action based on Defendant MetroPlus' unlawful retaliation including, but not limited to, wrongful termination of Plaintiff for filing her Equal Employment Opportunity Commission charge and otherwise opposing Defendants' unlawful race discrimination.

2.     Plaintiff additionally brings this action based on Defendants' violation of New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.*, ("NYSHRL"), and New York City Human Rights Law, N.Y. City Admin. C. § 8-101, *et seq.*, ("NYCHRL") for unlawful race discrimination and retaliation including, but not limited to, wrongful termination of Plaintiff for filing a charge with the New York Equal Opportunity Office and otherwise opposing Defendants' unlawful race discrimination.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction in this case under 28 U.S.C. § 1331 as Plaintiff brings suit under Title VII.

4.     This Court may assert supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims as authorized by 29 U.S.C. § 1367(a).

5.     Venue is proper within this judicial district, specifically the Southern District of New York pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events and/or omissions giving rise to the claims herein occurred in New York, New York.

6.     This Complaint is additionally brought pursuant to any other cause of action which can be inferred from the facts set forth herein.

## THE PARTIES

7.     Plaintiff is an African-American female, who has spent above 20 years in the Health Care Industry. Plaintiff is a resident of the United States who currently resides and at all times relevant to the Complaint resided in  the County of New York, State of New York, at 117 Seaman Avenue, Apartment 5D, New York, New York 10034.

8.     At all times relevant to the Complaint, Plaintiff was an individual and employee of Defendant MetroPlus within the meaning of 42 U.S.C. § 2000e.

9.      Upon information and belief, Defendant MetroPlus Health Plan is a wholly owned subsidiary of Defendant New York City Health + Hospitals Corporation, organized and existing under the laws of the State of New York and is authorized to do business in the State of New York.

10.     Upon information and belief, Defendant MetroPlus maintains its principal place of business at 160 Water Street, New York, New York 10038.

11.     At all times relevant to the Complaint, Defendant was an employer within the meaning of 42 U.S.C. § 2000(e), in that it is engaged in an industry affecting interstate commerce and employed more than 20 employees for each working day during each of 20 or more calendar work weeks in the current and preceding calendar year.

## CONDITIONS PRECEDENT

12.     Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about November 10, 2016.

13.     In or about March of 2017, Plaintiff received a Notice of Right to Sue from the EEOC, which was dated March 3, 2017. Thereafter Plaintiff filed a Summons and Notice in New York Supreme Court. Thereafter the matter was transferred to Federal Court.

## INTRODUCTION

14.     Plaintiff, a professional with over 20 years of experience in her field, was hired to work for Defendants as a Manager of Regulatory Affairs at Defendants on or about August 1, 2011.

15.     Plaintiff was a commensurate professional who went above and beyond her job description to do what was best for her workplace. As a result of her hard work, after three years, Plaintiff was promoted to Deputy Director of the Department and was charged with overseeing her Department. She was given an office and a $10,000.00 raise.

3

16.     Both before and after her promotion, Plaintiff supervised analysts who assisted her in completing her work.

17.     Plaintiff's work life was suddenly upended, however, when a new Associate Executive Director was hired, who subjected Plaintiff to blatant, overt discrimination on the basis of her race.

18.     Shortly after the New Associate Executive Director was hired, she demoted Plaintiff from Deputy Director of the Department, and replaced her with an unqualified Director who was Caucasian.

19.     Plaintiff's salary was reduced by $10,000.00, and she was transferred from her office back to a cubicle and her work was assigned to the analysts who were supposed to be reporting to her.

20.     Thereafter Plaintiff was alienated entirely.

21.     In addition, Plaintiff was shocked to see the new Associate Executive Director flat out refuse to even consider hiring African-Americans whom Plaintiff had recommended to be hired.

22.     When Plaintiff questioned these seemingly race based decisions, Defendants retaliated against her by not allowing her to fully participate in work-related functions, treating her as an unwelcome outcast, and scripting false, negative performance reviews.

23.     When Plaintiff reported the racial discrimination internally, she was further ostracized and retaliated against.

24.     Finally, when Defendants refused to respond to or investigate Plaintiff's internal complaint, Plaintiff reported the matter to the Equal Employment Opportunity Commission ("EEOC.")

25.     Thereafter, the Associate Executive Director and the Director further retaliated against Plaintiff by giving her a negative performance review and failing to implement an allegedly necessary Performance Improvement Plan.

26.     Defendants went to great lengths to alienate Plaintiff in an apparent attempt to constructively terminate her, but when she refused to allow them to bully her into quitting, they ultimately terminated her in retaliation for her complaints of discrimination, hostile work environment, and retaliation.

27.     As set forth in detail below, Defendants maliciously and intentionally subjected Plaintiff and other employees and employment candidates to disparate treatment and a hostile work environment because of their race, and retaliated against Plaintiff because of her lawful complaints. Accordingly, this is a civil action brought on behalf of Plaintiff against Defendants for discrimination and retaliation.

## OPERATIVE FACTS

### Plaintiff is Hired by Defendant MetroPlus

28.     Plaintiff is an African American female, with over 20 years of distinguished work experience and increasing responsibilities in the health care industry. Plaintiff received a Bachelor of Arts in Psychology from Fordham University.

29.     Thereafter, in 2003, Plaintiff received a Masters of Public Health from the New York Medical College. That same year, she also received a Certificate in Gerontology and a Health Insurance Plans of America ("HIAA") Certification in Managed Care and Integrating the Delivery and Financing of Health Care.

30.     Since 1995, Plaintiff has worked at some of the most renowned health care companies and agencies in the field, including serving as a Health Care Administrative Fellow at

the Greater New York Hospital Association; a Healthcare Consultant at Solutions for Action, Inc.; a Healthcare Provider Relations Representative for Royal Health Care, LLC; and a Manager at First Consulting Group.

31.     Plaintiff's significant management experience prior to working at Defendant MetroPlus includes serving as Project Director for Americhoice at the United Health Group, and as Senior Practice Manager at WIPRO.

**Plaintiff Is Widely Recognized at MetroPlus for her Outstanding Performance**

32.     On or about August 1, 2011, Plaintiff was hired as Manager of Regulatory Affairs at Defendant MetroPlus' Regulatory Affairs Department (hereinafter "Regulatory Affairs" or the "Department").

33.     At that time, Plaintiff reported to the Director of Regulatory Affairs, who shall be referred to hereinafter as "Director of Regulatory Affairs Doe."

34.     Defendants also employed Regulatory Analysts, who assisted and reported to Plaintiff.

35.     As a Manager of Regulatory Affairs, Plaintiff was responsible for ensuring that all new MetroPlus regulations were disseminated to members and implemented by all departments; responding to member and provider complaints to oversight government agencies; preparing and complying with plans of correction; leading MetroPlus in surveillance activities; responding to complaints and fair hearing requests; and developing relationships with state regulators.

36.     In addition, Plaintiff performed several additional tasks, including directing and supervising Regulatory Affairs analysts to ensure all plan documents received regulatory approval; providing testimony at grand jury hearings; writing department reports; and coordinating all audits of the Department.

37.     Plaintiff also developed and maintained relationships with outside organizations and businesses. Plaintiff regularly met all deadlines and completed assigned tasks. Plaintiff's work involved significant reading, research and writing, activities at which she excelled.

38.     Plaintiff was required to attend multiple internal and external meetings, and was often required to speak or present information at said meetings.

39.     Dr. Arnold Saperstein, President and CEO of MetroPlus (hereinafter "Dr. Saperstein"), relied on Plaintiff, and regularly praised her work. At one point he stated to her, "Narda, I can go to you with anything and I know it will get done."

40.     Plaintiff received uniformly positive performance reviews at Plaintiff during the first few years of her employment.

**Director of Regulatory Affairs Doe is Terminated**

41.     Upon information and belief, on or about April 2, 2014, Director of Regulatory Affairs Doe was terminated for ineffectuality and poor performance, and Mr. Ryan Harris, Director of Human Resources (hereinafter "Mr. Harris"), became Plaintiff's interim boss.

42.     That same day, Dr. Saperstein told Plaintiff in a meeting with Mr. Harris that because of her excellent work with the Department, including her exceptional response to increased responsibilities, she would be promoted to Director of Regulatory Affairs, with a salary increase of $10,000.

43.     Additionally, with her new role came a new office, and Plaintiff transferred from the cubicle where she had been working as a Manager to an office.

**Ms. Weinstein is Hired as Plaintiff's Direct Supervisor in a New Role**

44.     On or about June 2, 2014, Joyce Weinstein (hereinafter "Ms. Weinstein"), a Caucasian woman, was hired in a newly created role called "Associate Executive Director of Regulatory Affairs." Plaintiff, as Director, was required to report directly to Ms. Weinstein.

45.     Ms. Weinstein bizarrely failed to engage with Plaintiff in a substantive way and seemed reluctant to engage with her from the moment she commenced her new position.

46.     At no point throughout the time that they worked together did Ms. Weinstein provide meaningful constructive criticism or feedback to Plaintiff.

**Regulatory Analyst Cei is Hired to Assist Plaintiff**

47.     Thereafter, Plaintiff began looking for a Regulatory Analyst, and on or about July 14, 2014, Regulatory Analyst Lindsey Cei ("Analyst Cei") was hired. Analyst Cei reported to and was overseen by Plaintiff. Analyst Cei self identifies as Caucasian.

**Ms. Weinstein Displays Favoritism for Plaintiff's Caucasian Underling**

48.     Up and until Ms. Weinstein's arrival, Plaintiff without hesitation enjoyed her work at Defendant MetroPlus and was accordingly recognized again and again for her successful performance.

49.     Almost immediately after Ms. Weinstein's arrival however, Plaintiff noticed that Ms. Weinstein was not properly utilizing her and she soon realized that she was not being included in or invited to meetings that she was supposed to attend, including meetings with State Agencies.

50.      In or about July of 2014, Plaintiff learned that Ms. Weinstein was covertly inviting Analyst Cei to departmental meetings instead of Plaintiff.

51.     Plaintiff was not even told about the meetings, and only learned that she was being excluded when Analyst Cei came to her and asked Plaintiff why she had been invited to an Affordable Care Action meeting and why Plaintiff had not been there. Plaintiff responded that she

did not know, and had not even known there was a meeting. Thereafter, Analyst Cei continued to be included and Plaintiff continued to be excluded from departmental meetings.

52.     Bizarrely, Analyst Cei had no responsibility for the action items discussed at these meetings, and had just one year of health care work experience. It did not make sense for Ms. Weinstein to have such a junior person attend the meeting instead of Plaintiff, her direct supervisee.

53.     Analyst Cei also found her invitations to the meetings to be extremely strange. Analyst Cei continued to report to Plaintiff that Ms. Weinstein invited her to several meetings from which she excluded Plaintiff, and stated repeatedly that she found it strange.

54.     Soon thereafter, employees from the State Agencies that Plaintiff had long worked with started reaching out to her to ask why she wasn't attending meetings, why a less experienced Analyst was attending the meetings, and whether she could please start attending the meetings again.

55.     Plaintiff decided to approach Ms. Weinstein and ask her why she was being excluded from meetings that it was necessary for her to attend in order to do her job. Ms. Weinstein replied, "I did not intend for you to be excluded."

56.     Plaintiff was somewhat hopeful that Ms. Weinstein was telling the truth, and that she would thereafter be invited, but Ms. Weinstein bizarrely continued to exclude Plaintiff from meetings on a regular basis and invite Analyst Cei instead.

57.     When Plaintiff asked Ms. Weinstein, "Why would you take Analyst Cei, when I am the person that should attend those meetings?" Ms. Weinstein responded, "Oh well, I just want to give her a chance to see what it is like… . Don't make a big deal out of it, I just wanted to take Analyst Cei."

58.     Plaintiff found Ms. Weinstein's "explanation" to be insufficient as the meetings had no relevance to Analyst Cei's job regular duties, whereas Plaintiff required the information from these meetings to properly do her job.

59.     Not only would Ms. Weinstein refuse to allow Plaintiff to attend important meetings, she also refused to provide her with information from the meetings, even though she needed that information to do her job. When Plaintiff would ask Ms. Weinstein about what occurred during the meeting, she would say, "Oh, Analyst Cei is already summarizing it."

60.     Analyst Cei repeatedly told Plaintiff that she found it "so weird" that she was being asked to attend the meetings and summarize the information and that she did not understand why Plaintiff was being excluded.

61.     Around the same time, Plaintiff noticed and heard that other black employees in the office were also receiving similar condescending treatment, but that Caucasian and non-black minority employees were not being treated badly by Ms. Weinstein.

**Ms. Weinstein Refuses to Hire African-American Applicants**

62.     As part of her role as Director, Plaintiff was responsible for recommending potential employees to Ms. Weinstein for two open Regulatory Analyst positions. Plaintiff recommended several people to be interviewed. Of the candidates that applied for the position, the four that Plaintiff found most qualified happened to be African American, and she recommended all four candidates.

63.     None of the four African American candidates were considered by Ms. Weinstein. Upon information and belief, they were excluded from consideration due to their race.

64.     On or about October 29, 2014, Plaintiff interviewed and recommended an African American candidate who had attended University of Pennsylvania for her undergraduate degree

and Carnegie Mellon University for Graduate School. The candidate happened to have an afro hairstyle.

65.    Regulatory Analyst Cei also interviewed the candidate and stated that "[she] loved her" and thought she would make a great candidate.

66.    Ms. Weinstein agreed to interview and did interview the candidate, but stated that "[she] didn't know about her, because she seem[ed] like a free spirit."

67.    Upon information and belief, Ms. Weinstein did not consider the candidate to be professional because of her afro hairstyle.

68.    Upon information and belief, Ms. Weinstein did not like the candidate because she was African American and because she had an afro, and refused to seriously consider her for the open position. Analyst Cei also expressed shocked that Ms. Weinstein refused to consider the candidate.

69.    When Plaintiff pushed Ms. Weinstein to give a reason other than that the candidate "seemed like a free spirit," Ms. Weinstein responded with a different reason, this time saying that she "wanted someone with law experience."

70.    Plaintiff found this reasoning disingenuous, as the position did not demand any prior legal experience whatsoever.

71.    However, Plaintiff took Ms. Weinstein's critique of the first candidate to heart, and on or about February 18, 2015, Plaintiff recommended a second candidate for the Analyst Position. The second candidate was also well qualified for the role, and she had the extra "law experience" that Ms. Weinstein claimed to be looking for.

72.    Soon thereafter, Analyst Cei interviewed the second candidate. Based on the interview, Analyst Cei also found the second candidate to be highly qualified for the position.

11

73.     Nonetheless, Ms. Weinstein flatly refused to make an offer to the second candidate, who also happened to be African American, for the role without any further explanation.

**Ms. Weinstein Unexpectedly Gives Plaintiff Her First Negative Review**

74.     On or about March 2, 2015, Plaintiff was shocked when, despite her continuing hard work and exceptional effort for Defendants, she received a negative review from Ms. Weinstein; the first poor review she had received during her three-years at Defendants. Plaintiff was especially surprised because Ms. Weinstein had not bothered to engage with her in a meaningful way, had not provided any constructive criticism leading up to the negative review, and refused to allow Plaintiff to participate in the Department's activities.

75.     Believing strongly that the evaluation was unrepresentative of her work, on March 20, 2015, Plaintiff drafted a rebuttal detailing her stellar performance at Defendants and further questioning the way Ms. Weinstein was treating her. On March 25, 2015, Plaintiff was advised that her performance evaluation would nonetheless remain unchanged.

**Ms. Weinstein Shockingly Demotes Plaintiff for No Apparent Reason**

76.     Without warning, on April 1, 2015, Ms. Weinstein called Plaintiff into her office. Ms. Weinstein told Plaintiff that she was being demoted from "Director of Regulatory Affairs" to "Deputy Director" of the Department.

77.     She further revealed that Defendants were looking for a new Director but not had found one yet and that there simply would be no Director until a new one was named.

78.     Plaintiff was mortified and disheartened. When Plaintiff asked for an explanation, Ms. Weinstein stated, "[she] didn't *feel* that [Plaintiff] could perform at the level she expected of the Director role."

79.     Plaintiff was shocked and confused. Plaintiff told Ms. Weinstein that the recent negative review was the first time that she had ever received any notice that there were specified expectations, let alone that she was falling below these expectations, and she further advised Ms. Weinstein that because she was being excluded from highly relevant meetings, she could not properly do her job.

80.     Further, Plaintiff found it very strange that she was demoted before a new director was named. Upon information and belief, Ms. Weinstein was so intolerant of Plaintiff that she would rather have had the Director position empty than have Plaintiff remain in it any longer.

81.     Further, Plaintiff understood that Ms. Weinstein's goal in demoting Plaintiff was part of an overarching plan to push Plaintiff to quit, because Ms. Weinstein, upon information and belief, did not want African American people on her staff.

**Plaintiff Refuses to be Forced Out**

82.     Although Plaintiff suffered severe embarrassment and a $10,000 cut in salary because of the demotion, she nonetheless vowed to work cooperatively with the new Director, whomever he or she would be, and with the Regulatory team.

83.      A month later, on or about May 11, 2015, Plaintiff found another highly qualified applicant, who also happened to be an African American female, and recommended her for the Regulatory Analyst Position, which remained open.

84.     Although at this point Plaintiff had an uncomfortable feeling that because the third candidate was also African American, Ms. Weinstein was unlikely to consider her for the position, Plaintiff recommended her anyway because she was highly qualified. Without explanation, yet again, Ms. Weinstein refused to consider the third candidate for the open position.

**Ms. Weinstein Hires a less Experienced, Non-Black Woman as Director**

13

85.     On June 15, 2015, Ms. Weinstein hired Fredeswinda Negron (hereinafter "Ms. Negron"), a Hispanic-American woman, as Director of Regulatory Affairs. Upon information and belief, Ms. Negron had less experience than Plaintiff in their chosen field, did not have a Master's Degree like Plaintiff, and had less experience in the Regulatory Department than Plaintiff.

86.     That same day, on June 15, 2015, Ms. Weinstein gave Plaintiff a "Fully Competent" follow up performance review, but outlined several ways in which Plaintiff could allegedly improve.

87.     Because Ms. Weinstein had sidelined and ignored her at all times since she was given the negative review, and because she continued to work as diligently after the negative review as she had before the negative review, it appeared that both reviews were entirely subjective and meaningless.

**Defendants Discriminate Against Plaintiff by Taking Away Her Responsibilities**

88.     Immediately after Ms. Negron commenced her employment, it was clear that she, upon information and belief, had been instructed to alienate Plaintiff and that Plaintiff was not wanted on the team.

89.     Ms. Negron and Ms. Weinstein took away from Plaintiff responsibilities that were previously under Plaintiff's purview, even responsibilities she held when she was Manager of Regulatory Affairs (prior to her promotion to Director).

90.     For example, at all times during both of her previous roles at Defendants, Plaintiff supervised two Regulatory Analysts, and received outstanding performance reviews for this supervision. From the date of Ms. Negron's hire, however, all Regulatory Analysts were required to report to Ms. Weinstein and Ms. Negron only, and not to Plaintiff at all.

91.     In addition, Ms. Weinstein and Ms. Negron told Plaintiff that she was no longer responsible for several major components of her job, at which she had excelled as both Manager and as Director. Plaintiff was relegated to essentially administrative tasks.

**Analyst Cei Quits and New Analysts Are Hired**

92.     On or about August 15, 2015, Analyst Cei resigned. Dolly Cardenas, of Hispanic descent, was hired as a Regulatory Analyst on or about August 31, 2015. On or about September 8, 2015, Anis Min, of Asian descent, was hired as a Regulatory Analyst. On September 21, 2015, Elizabeth Moo, of Asian descent, was hired as a Regulatory Assistant. On October 5, 2015, a Caucasian woman named Raven Ryan Solon was hired as the Privacy Officer.

**Ms. Negron and Ms. Weinstein Exclude Plaintiff from Meetings with Higher-Ups**

93.     Additionally, Ms. Negron and Ms. Weinstein continued to regularly exclude Plaintiff from crucial meetings with higher-ups at MetroPlus, including outside organizations, and businesses – meetings that Plaintiff had previously attended as both as a Manager and as a Director of Regulatory Affairs.

94.     Instead, Ms. Negron and Ms. Weinstein asked far less experienced Regulatory Analysts and interns, all of whom were non-African Americans, to attend these meetings.

**Defendants Schedule Essential Meetings Outside of Plaintiff's Work Hours**

95.     Bizarrely, Ms. Negron insisting on changing the time of department-wide meetings until 4:00 p.m., even though Plaintiff's hours were 8:00 am to 4:00 pm. Upon information and belief, she did so for the sole reason of excluding Plaintiff.

96.     When Plaintiff offered to stay at work after her regularly scheduled hours to attend the 4:00 meetings, she was told "[not to] be ridiculous."

**Plaintiff is Moved from an Office to a Cubicle**

97.     As a further insult, on or about October 23, 2015, Ms. Weinstein forced Plaintiff, the Deputy Director of the Department, to move her things from her own private office into a cubicle beside the Regulatory Analysts, so that a young new hire, MetroPlus' Privacy Officer, could move into the office.

98.     This severely affected Plaintiff's morale, and caused her to suffer abject humiliation in front of her younger subordinates.

**Ms. Negron Refuses to Hire a Qualified African-American Applicant, or Consider Prior African-American Applicants**

99.     Meanwhile, Ms. Negron continued Ms. Weinstein's established practice of refusing to hire African-American applicants for the Regulatory Affairs position. Plaintiff soon recommended another qualified applicant who happened to be an African-American woman for the position. The candidate had excelled as an intern with the Department.

100.     Ms. Negron bizarrely told Plaintiff that the candidate could not be considered because she had not applied through Human Resources online portal.

101.     The candidate later told Plaintiff that this was not true, and that she had applied through the portal.

102.     Instead, in or about August and September 2015, Ms. Weinstein hired Dolly Cardenas, a Hispanic-American (hereinafter "Ms. Cardenas"), Anis Min, an Indian-American (hereinafter "Ms. Min"), and Elizabeth Moo, an Asian-American (hereinafter "Ms. Moo"), as Regulatory Analysts, three persons who had equal or lesser experience than the multiple African-American women that Plaintiff had recommended.

**Plaintiff Files an Internal Complaint and Tries to Fix the Problem**

103.     On or about October 15, 2015, Plaintiff, under stress because of the discrimination and hostile work environment she faced, and troubled by Ms. Weinstein's failure to even consider hiring multiple qualified African-American employees, spoke to a former direct report of Plaintiff's with whom she felt comfortable.

104.     That employee advised Plaintiff that she believed that Plaintiff was being discriminated against because of her race and that she should file a complaint with Defendants' internal EEO office.

105.     Plaintiff responded, "I didn't want to believe that in this day and age." The employee replied, "Based on everything that has been happening, that's what it looks like to me."

106.     Thereafter, on or about November 24, 2015, Plaintiff contacted Defendants' internal EEO officer to report that she was being discriminated against because of her race, and also to report Ms. Weinstein's refusal to consider qualified African American candidates.

107.     One day after she filed her complaint, Plaintiff asked for a meeting with Ms. Negron, COO Diamond, and Mr. Harris to discuss her role within the Department, and the way she was being treated. She also revealed that she had filed an internal report with the Defendants' EEO office.

108.     Immediately following this meeting, COO Diamond asked Plaintiff to his office for a private meeting. COO Diamond told Plaintiff that some people in the Department were "uncomfortable" with her, and that it perhaps would be best if she were to leave MetroPlus. Plaintiff responded that she loved her job, had no plans to leave, did not want to leave, and should not be asked to leave because of her race, or because she had complained about race discrimination.

109.     She further asked COO Diamond to make sure that the discrimination and hostile work environment stopped immediately.

**Defendant Subjects Plaintiff to Increased Hostility in Retaliation for her Lawful Complaints**

110.    Thereafter, Plaintiff suffered severe retaliation for both her internal NYC EEO complaint, and her complaints to COO Diamond.

**Ms. Negron and Ms. Weinstein Continue to Shut Plaintiff Out of Meetings**

111.    Ms. Negron and Ms. Weinstein continued to shut Plaintiff out of meetings with higher-ups, organizations, and businesses, which she used to attend as Manager and Director of Regulatory Affairs, and instead asked less experienced Regulatory Analysts and interns to attend.

112.    Plaintiff repeatedly asked Ms. Negron and Ms. Weinstein to include her in these meetings, but they dismissed her concerns, saying falsely that the meetings were not pertinent to her work.

**Ms. Negron and Ms. Weinstein Continue to Remove Plaintiff from Distribution Lists**

113.    In addition, Ms. Negron and Ms. Weinstein removed Plaintiff from even more Regulatory Affairs email distribution lists, including those lists on which she had been included as both a Manager and Director of Regulatory Affairs. Plaintiff repeatedly asked Ms. Negron and Ms. Weinstein to include her on these distribution lists, but they refused.

**Ms. Negron and Ms. Weinstein Belittle and Embarrass Plaintiff**

114.    At the same time, Ms. Weinstein and Ms. Negron found ways to belittle or humiliate Plaintiff by repeatedly stating that she was not a "member of the leadership team" in the Department. Indeed, they even went so far as to remove Plaintiff's name from the PowerPoint slide representing those responsible for the work of the department.

115.    Ms. Negron also as a matter of course chose Regulatory Analysts or interns as her "Out of Office" contacts, to which business should be addressed while she was away, rather than Plaintiff, even though Plaintiff was the Deputy Director of the Department.

116.    Indeed, the entire staff soon realized that Plaintiff was "no one" and that she should be ignored or belittled, as were other African American employees. On February 18, 2016, Plaintiff was speaking to an African American male colleague, when one of the Regulatory Analysts approached them and stated, "What are you two troublemakers are up to?"

117.    Upon information and belief, the African American male eventually quit. He advised Plaintiff that he quit because of Ms. Weinstein's racism.

**Ms. Negron Purposefully Interferes with Plaintiff's Work**

118.    Soon, the Defendants changed the password for a database that Plaintiff needed to access in order to do her work. When Plaintiff asked Ms. Negron for the new password, she was told she could not have access to the database, and that she should ask the Regulatory Analysts, who were allowed to have access to the database, for information that she needed. Upon information and belief, there was no rational reason that Plaintiff should not have direct access to the database.

**Plaintiff Continues to Be a Stellar Employee**

119.    Despite the discrimination and hostile work environment, Plaintiff dutifully worked on every task assigned to her with the same level of excellence that she applied to all of her work, staying past 4:00 p.m. when necessary to complete her tasks. In addition, Regulatory Analysts continuously came to Plaintiff for help with their work, since they were often doing work that should have been assigned to someone with more experience, like Plaintiff, and Plaintiff was happy to oblige.

120.    Ms. Negron and Ms. Weinstein praised the Analysts for their work, but never once acknowledged Plaintiff's role in assisting them.

121.    For example, on or about December 10, 2015, a Regulatory Analyst named Anis Min was asked to represent MetroPlus at a meeting with higher-ups. Plaintiff, who had regularly given such presentations before the discrimination, cooperatively gave Analyst Min her presentation outline and all of her work before the meeting, and Ms. Min reported back that Ms. Weinstein and Ms. Negron said that her presentation was "excellent." Plaintiff received no acknowledgement from either Ms. Weinstein or Ms. Negron for her work.

**Plaintiff Files an EEOC Claim and the Retaliation Worsens and Intensifies**

122.    On or about March 29, 2016, Plaintiff, distraught at the way she was being treated, even after filing an internal complaint, and demoralized by these incidents of retaliation and discrimination, filed an EEOC charge.

**Ms. Negron Gave Plaintiff an Unjustified Poor Performance Review, Setting her up for Termination less than two weeks after Plaintiff files her EEOC Complaint.**

123.    Soon after filing her EEOC Complaint, Plaintiff received a "Needs Improvement" performance review (the "NI Review") on April 7, 2016 from Ms. Negron. Plaintiff's performance review criticized her for not completing work that Defendants intentionally obstructed her from completing and that she was failing to engage, even though she was purposefully excluded from meetings she repeatedly attempted to attend. The NI Review further set forth allegations that were easily disproven by Plaintiff in the following days, to no avail.

124.    Although Plaintiff was told that she would be placed on a Performance Improvement Plan, no plan was ever set forth.

125.    Upon information and belief, Defendants believed that they could not fire Plaintiff unless they had first given her a poor performance review and the NI Review was a necessary step in creating an opportunity to terminate her.

126.    Plaintiff reported this review and her suspicions that she was being retaliated against for filing a discrimination charged against Defendants to Mr. Harris. Mr. Harris informed Plaintiff that he had in fact told COO Diamond that Plaintiff had filed an EEOC complaint. He further advised her that he had told COO Diamond prior to Plaintiff's most recent review that she could not be fired without a poor performance review.

127.    Thereafter, Plaintiff learned that, upon information and belief, she had been excluded entirely from the Department contact list that Defendants had submitted to the State.

128.    Ms. Negron and Ms. Weinstein continued to exclude Plaintiff from important meetings she used to attend as Manager and Director of Regulatory Affairs and instead, continued to ask Regulatory Analysts and interns to attend in her stead. For example, Ms. Negron and Ms. Weinstein excluded Plaintiff from a meeting regarding Article 44 on April 22, 2016; a meeting regarding Department policies and procedures on May 3, 2016; a meeting regarding CHP rules on May 9, 2016; and another meeting regarding Article 44 on May 13, 2016. In addition, Ms. Negron and Ms. Weinstein continued to remove Plaintiff from Regulatory Affairs email distribution lists, also known colloquially as "logs."

**Plaintiff's Team Begins Ignoring her Entirely**

129.    By May of 2016, even the analysts, assistants and interns who had previously exchanged pleasantries with Plaintiff began to ignore her almost entirely refusing to even say hello or goodbye.

130.    In addition, Ms. Negron and Ms. Weinstein continued to remove Plaintiff from Regulatory Affairs email distribution lists. In one crucial example, on July 11, 2016, Plaintiff's name was removed from the Department distribution list for a quarterly report that she herself drafted for the Department.

131.    As one example of the implication of removal from the Department distribution list: on July 13, 2016, Plaintiff though still intentionally locked out from the distribution list was expected to create the up-to-date QAC draft report by the end of the day for Ms. Negron.  Plaintiff, determined to meet Ms. Negron's deadline, stayed in the office until 6:40 pm well beyond Plaintiff's normal work hours waiting on Analyst Min, who had access to the distribution list, to provide Plaintiff with updated data.

**Plaintiff Continues Her Stellar Work, But Is Never Acknowledged**

132.    During this time period, Plaintiff continued to help the Regulatory Analysts with their tasks without complaint, and Ms. Negron and Ms. Weinstein praised their efforts but did not acknowledge Plaintiff's presence or her hard work. Nonetheless, Plaintiff dutifully worked on every task assigned to her with the same level of excellence that she applied to all of her work.

**Ms. Negron Is Openly Hostile to Plaintiff, and Refuses to Invite her to Events**

133.    Meanwhile, the hostility was ever increasing. Ms. Negron childishly invited all staff members *except Plaintiff* to Ms. Solon's office to sing to her "Happy Birthday."

134.    Adding insult to injury, on June 16, 2016, during a Department meeting, Ms. Weinstein asked another non-African American employee to shift seats so she did not have to sit next to Plaintiff.

135.    Plaintiff was regularly excluded from meetings to discuss Medicaid Managed Care Contract and Article 44 on June 29, 2016 and again on July 8, 2016, even though she could not properly perform her job without attending the meeting.

136.    Ms. Negron hosted a Medicare meeting with Regulatory Staff on July 19, 2016 and Plaintiff was not invited. She was also excluded from important meetings such as the following: a SharePoint meeting on August 17, 2016; DCMS training on September 1, 2016; Article 44 meeting on September 7, 2016; Conference Call with the State on September 7, 2016; Article 44 meeting on September 8, 2016; Article 44 meeting on September 12; Article 44 meeting on October 5, 2016.

137.    October 11, 2016, Elizabeth Moo distributed a card for everyone to sign for a staff member's birthday, *except Plaintiff*.

138.    October 19, 2016, Ms. Negron asks Ms. Min to present at the monthly Regulatory Affairs Meeting, and Ms. Cardenas to attend the QMC meeting, things that Plaintiff used to do.

139.    Ms. Negron invited everyone but Plaintiff to a birthday celebration for Ms. Moo on November 15, 2016.

140.    The hostile work environment continued until on December 6, 2016, Plaintiff was the only employee to be excluded from Ms. Negron's Holiday luncheon.

141.     That same week Ms. Negron gave holiday cards to every employee but Plaintiff. She did so conspicuously so that Plaintiff would know she was being excluded.

## Defendant Fires Plaintiff Under False Pretenses And Because of Her Discrimination Complaints

142.    On February 17, 2017, Plaintiff was terminated for what Ms. Negron and Ms. Weinstein told her was poor performance. Upon information and belief, she was fired because Ms.

Weinstein did not want black employees working for her, and in retaliation for complaining internally and externally that she was being discriminated and retaliated against.

## AS AND FOR A FIRST CAUSE OF ACTION
*(Race and/or Color Discrimination under Title VII)*

143.   Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "142" as if set forth herein.

144.   Plaintiff is an African American female at all relevant times and is therefore a member of a protected class under 42 U.S.C. §§ 2000 *et seq.*

145.   Plaintiff was and is qualified to work as an employee for Defendants and she was able to satisfactorily perform the duties required by all positions she held at Defendants.

146.   Defendants subjected Plaintiff to a hostile work environment and an atmosphere of adverse employment actions and decisions because of her race and/or color.

147.   By reason of Defendants' violations of Plaintiff's rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

148.   As a further direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her future employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

## AS AND FOR A SECOND CAUSE OF ACTION
*(Race and/or Color Discrimination under NYSHRL and NYCHRL)*

149.   Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "148" as if set forth herein.

24

150.    Plaintiff is an African-American female and is therefore a member of a protected class under the New York State and New York City Human Rights laws.

151.    Plaintiff was illegally discriminated against because of her race and/or color when Defendants demoted Plaintiff and regularly made employment decisions adverse to Plaintiff because of her race and/or the color of her skin.

152.    The race discrimination Plaintiff suffered while employed at Defendants was severe and pervasive, unwelcome by Plaintiff, and would be offensive to a reasonable person.

153.    The race and/or color discrimination that Plaintiff suffered while employed at Defendants severely affected the terms and conditions of her employment, as set forth in detail here and above.

154.    Plaintiff repeatedly reported the discrimination to Defendants' management and it was repeatedly witnessed by Defendants' management and employees. Therefore, Defendants knew or should have known about the discrimination and the effect it had on Plaintiff's employment. Nonetheless, Defendants failed to take the necessary remedial actions.

155.    As a direct and proximate result of said unlawful employment practices, Plaintiff has suffered the indignity of discrimination, the invasion of her rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

156.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation,

disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

157.    Plaintiff was discriminated against and subjected to race and/or national origin that created a hostile work environment by Defendants based on her race and/or skin color in violation of the New York State and New York City Human Rights Law. As a result of Defendants' violation of the New York State and New York City Human Rights Law, Plaintiff has been damaged in the sum of no less than $1,500,000.

## AS AND FOR A THIRD CAUSE OF ACTION
*(Retaliation under Title VII, NYSHRL and NYCHRL)*

158.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs "1" through "157" as if set forth herein.

159.    As set forth in detail above, Defendants subjected Plaintiff to a hostile work environment, disparate treatment, and an atmosphere of adverse employment actions and decisions because of her race and color in violation of Plaintiff's statutory rights.

160.    Plaintiff repeatedly complained to Defendant and/or Defendant's policymakers who themselves regularly witnessed the severe and pervasive race and color discrimination and hostile work environment she was subjected to during her employment with Defendants.

161.    Plaintiff notified Defendants of the severe race, color and gender discrimination and hostile work environment she was subjected to and protested the daily harassment and the fact that Defendants failed to act responsively.

162.    Plaintiff's complaints were repeatedly ignored and discouraged by Defendants in accordance with Defendants' policy, practice, and/or custom of discrimination and retaliation.

163.    Defendants, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of race and/or color discrimination and a hostile work environment.

164.    Because she protested Defendants' unlawful behavior, Plaintiff was subjected to retaliation throughout the course of her employment.

165.    When Defendants, including its management and employees, learned that she had formally reported the unlawful behavior that she protested, Defendants' harassing behavior only increased and ultimately culminated in Plaintiff's termination from her position.

166.    Defendants knew or should have known about the retaliation and the affect it had on Plaintiff's employment but Defendants failed to take any action to stop the retaliatory conduct, and in fact allowed Plaintiff to suffer a retaliatory termination.

167.    As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of his rights to be free from discrimination, and great humiliation, which has manifested in severe emotional stress. As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

168.    Based on the foregoing, Plaintiff was retaliated against and suffered a retaliatory termination by Defendants in violation of Title VII of the Civil Rights Act of 1964, the New York

State Human Rights Law, and the New York City Human Rights Law. As a result of Defendants' retaliatory actions, Plaintiff has been damaged in the sum of no less than $1,500.000.00.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

i.      On the First Cause of Action, awarding Plaintiff compensatory and other damages including punitive damages in an amount to be determined at trial but in any case no less than $1,500,000.00.

ii.      On the Second Cause of Action, awarding Plaintiff compensatory damages and other damages in an amount to be determined at trial but in any case no less than $1,500,000.00.

iii.      On the Third Cause of Action, awarding Plaintiff compensatory damages and other damages in an amount to be determined at trial but in any case no less than $1,500,000.00.

iv.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

Dated: New York, New York
       August 28, 2017

 

                                        GODDARD LAW PLLC
                                        *Attorneys for Plaintiff*

                                        By:      s/ *Megan S. Goddard*
                                        Megan S. Goddard, Esq.
                                        39 Broadway, Suite 1540
                                        New York, New York 10006
                                        (646) 504-8363

ZACHARY W. CARTER
Corporation Counsel of the City of NY
*Attorneys for Defendants*
*Attn:* Emery Lyon, Asst. Corp. Counsel
100 Church Street, Room 2-138
New York, NY 10007
Tel: 212-356-2442